And we will now hear Inouye Watson Laboratories, Inc. We have 23, 410, 418, 420, and 423. And we understand that we will proceed first for the appellant, Mr. Refson, who will then hold two minutes for rebuttal. Exactly. And then Mr. Grossman, and that will be divided ten minutes and then five minutes, is that the plan? Yes, your honor. And then for the appellee, we have Mr. Brannon, who will be 15 minutes. Yes, your honor. Okay. Whenever you're ready. Okay, good morning, and may it please the court. My name is Barry Refson, and I'm arguing today on behalf of all plaintiff's appellants. This case requires the court to determine what a plaintiff must allege to state an antitrust claim under the Supreme Court's opinion in FTC versus activists. In activists, the Supreme Court held that reverse payments used to settle hatch waxman patent litigation are subject to antitrust scrutiny under the rule of reason. In this case, the plaintiff's alleged a reverse payment was made by Forrest to six generic competitors. May I make a statement? Yes. May not be appropriate or proper, but still. You talked about the main case here, but one of my problems that kind of runs through this case is not that opinion, but the opinion in Twombly and the question of whether the district court judge was properly applying Twombly with respect to plausibility, was the district court trying to find out whether the allegations in the complaint were plausible, or was he trying to decide, or did he in fact decide that it was plausible, but not as plausible as the other side, and somehow that question has been running through my mind as I've been reading all these documents. Yes, Judge Sack, I think that is a very important issue here, is whether the claim that we've stated is plausible under both activists and Twombly. And I was going to say that there are three reasons why we believe the district court's opinion should be reversed. The first is that it's contrary to the explicit holding of activists itself, because the issue in activists was actually the same as the issue here. It involved whether the FTC had properly stated a claim under Section 1 of the Sherman Act. The second is that the district court put the burden on the plaintiffs to establish a lack of justification, whereas activists puts the burden of proving justification on the defendants to be proven in the course of the case. And the third is the point that you just made, which is that the district court violated basic pleading rules under Rule 12b6, including Twombly, that the district court made determinations as to whether the allegations made by the plaintiffs were less plausible, or whether the defendant's arguments were more plausible than the plaintiff's. And that's absolutely wrong under Twombly, under this court's opinion in Anderson. Under basic 12b6 pleading rules, the allegations made by a plaintiff in a complaint are to be taken as true. I mean, every law school student knows that. And that all inferences are to be made in favor of the plaintiffs. That's clearly not what the district court did here. The district court, on at least 12 different occasions, rejected allegations made by the plaintiffs in their complaint. Because those allegations, because it said that the defendant's arguments were entirely plausible, were more plausible than the plaintiff's, were equally as plausible, were equally explicable, or were just as consistent as the plaintiff's inferences, and those were wrong under any conception of the pleading rules. And we think that that issue alone is sufficient to require the reversal of the district court's opinions. Would you agree that it was your burden in the pleading to plead under Twombly, that each transaction was unjustified or unexplained? What we, our burden under activists and under- Not just- And under- Which some of this may be, but unexplained and Yes, the plaintiffs have a burden under activists and under Twombly to make a plausible claim that the defendants made a reverse payment to the generics to settle patent litigation. And our principal position in this case is that if we plausibly plead that a reverse payment had been made, that the brand manufacturer paid the generic manufacturer, that that's sufficient to establish both large and unjustified for purposes of pleading. Now that's our position, we didn't leave it- Hang on, hang on a second. All you have to plead is that the payment was made, and that that on its face establishes both large and unjustified? Is that your position? Not quite. Our position is that we have to plead that there was a payment that was made- Right. The patent settlement, that it exceeded any conception of saved litigation expenses. Okay, so that's large. And that's large, and also under activists, litigation expenses serve two purposes under activists. It's also a measure of large, and it's also a possible explanation for the payment. So that fact that it appears to be in connection with the settlement to induce the entry date, and that it exceeds litigation costs is also enough, at least at the pleading stage, to establish that discovery in this case might show that the defendants didn't have an explanation for this. So are you saying that for pleading purposes, establishing that something is large, in the sense of in excess of anticipated litigation costs, is adequate to show also unjustified? Well, I believe that's correct. That's not where we left our complaint. I mean, our complaint goes way beyond just saying that it's exceeded- Well, I understand, but then in your view, that's surplusage. It is. My view is it's surplusage, but that our case is not one that's close to the line. Because in addition to pleading all that, and by the way, our allegations are not just labels that we put on conduct. Our allegations were based on an internal memo from Forrest that said, these were side deals that were connected with the settlement. And we had a document from an in-house lawyer that said they're side deals. All six deals were side deals. And we have the merger document by Forrest that put a value on these payments. It said they're all in excess of $15 million. In addition to all of that, we allege that the kinds of deals here that these parties entered into are not deals that brand and generic companies generally engage in outside the context of settlement. And we cited an academic study for that point. And we also pointed out that these are kinds of deals that brand name companies enter into when they're trying to make reverse payments. It's similar to the kinds of deals- It's connected with the settlement. But suppose that it's also, to the extent that it exceeds the litigation value, for value in an otherwise good faith transaction. Well, I think all those issues that you just named, Judge Jacobs, are issues that need to be explored in discovery to determine whether they're- Well, don't they have to be pleaded? A lot of the, whether the defendant- In a perfunctory way. Well, we did- Because there are, these are other transactions. I mean, they have terms. They were, now you're saying they're not the kind of things that they would usually enter into. Do they have to be? I think that there are a lot of different facts that may bear on whether this is an exchange for, to delay, to induce the generic delay, or whether this is an independent deal. I mean, our complaint, and just to be clear, our complaint did not leave it at that. We went through each of these deals and we made allegations why each of these deals were not, did not appear to be independent deals. And for instance, we had the hetero deal, which was for API supply, for a supply of active pharmaceutical ingredient. And we said that just seven months before this side deal was entered, because Paris entered into the side deal with hetero, it entered into a deal with Jacobs, with Janssen, its long-term supplier, for all of its requirements. And this is just seven months before, so it didn't carve out any- But the deal had to do with price. I mean, if a lower price was an offer to supply the same stuff, it was made by another supplier, and Janssen had to meet it. And there were all kinds of details in that Janssen agreement that you kind of glossed over. All those details are issues that are issues for discovery. And by the way, that meter release provision that the defendants rely on so much, that's a provision in the Janssen agreement. If you look at the provision in the Janssen agreement itself, it says that provision did not come into effect until January of 2016. So based on the face of that agreement itself, it probably doesn't apply. But the plaintiffs don't know that. I mean, the defendants just produced certain of the agreements to us before, during the motion to dismiss process. We don't have discovery about how all those things apply. But like I said, if you were taking those agreements and making inferences in favor of the plaintiffs, you wouldn't assume that they beat that price. There's no evidence that they beat the price. We don't know what the price was that Janssen was selling for. I mean, the district court assumed that those agreements would be justified. And by the way, the activist itself rejected assumptions that agreements were legal. I mean, that was the scope of the patent test that lower courts, including this court, had adopted. Like in this court's Tamoxifen opinion, the Supreme Court rejected the assumption that reverse payments are legal. And it said that justifications are to be proven in the course of the antitrust litigation. And justifications are within the possession of the defendants. I mean, the plaintiffs did not know, were not at the table for any of the negotiations of these agreements. And all the facts about pricing and why defendants entered into these are in the possession of the plaintiffs. And that's why the lower district courts, the lower courts after activists, have looked in the pleadings as to whether the issue of large was adequately pled, and whether it was in excess of litigation costs. I mean, for instance, the Third Circuit in Lipitor said that what needed to be pled post-activist was that it was large, that the agreement was made in connection with a settlement involving the entry date, and that it exceeded a litigation cost. And all these issues about explanation, once you see a large payment, are to be explored during discovery and explored at summary judgment. And if there is a disputed issue of fact at summary judgment, there are issues for trial. But we pled with respect to each of these six deals, very specific reasons to believe, to suggest that these were not independent deals, that they were entered into, that they would not have been- They have to be independent, that's sort of what I was asking you earlier. They have to be independent, or can they indeed be connected with the settlement? No, I think that the key issue in activists is the reason for the payments. And this is at activist 570 US at 158. Or the sufficiency of consideration for the deal that's entered. I think it has to be the reason for the deal. Was it to induce a delay and create anti-competitive purposes? Or was this a deal that was unrelated to the settlement and something that would not have been used to induce a delay? I mean, the Supreme Court said that at 570 US at 158. And the court said, although the parties may have reasons to prefer settlements that include reverse payments, the relevant antitrust question is, what are those reasons? If the basic reason is a desire to maintain and to share patent-generated monopoly profits, then in the absence of some other justification, the antitrust laws are likely to forbid the arrangement. I mean, that's a factual issue. You have to decide why they did these deals. Were these deals done because they were independent and for fair value and they were unrelated to the settlement? Or were they done to induce the settlement? And I guess I would point out that the issue of fair value is a possible justification. But the lower courts have said that fair value is not a silver bullet. I mean, it's a factor that the Supreme Court identified as a reason why these deals might be done. But you could have fair value and you could still conclude that this deal was done to induce generic delay and that would be a factual issue for exploration in discovery and at summary judgment and possibly at trial. Okay, I think we've taken you over your time a little bit and you've held on to a couple minutes of rebuttal. Why don't we hear from Mr. Grossman? Thank you, Your Honor. For the FTC, right? Good morning, Your Honors. May I please- Has the Supreme Court done away with the FTC yet? We're still kicking, although one of the amicus briefs in this case seems not to think so. But I'm still here, Your Honor. Presumably you're going to get paid for this oral argument. I have to check my bank account after this presentation, but hopefully that didn't cut into my time. Good morning, Your Honors. May it please the court. Brad Grossman for amicus, the Federal Trade Commission. The FTC is concerned that the district court's ruling goes against activists and basic rules of pleading. And that the court's reasoning could create prohibitive new burdens to pleading a drug monopolization case. Under activists, the question here is whether the plaintiffs adequately alleged that the side deals were part of a quid pro quo to get generic rivals to stop challenging its monopoly. As Mr. Refson said, page 158 of activists resolves that. What was the reason for the transaction? When the district court dismissed here, it speculated about how Forrest might defend these agreements and found that speculation equally or more plausible than the complaints. That motive analysis cannot be squared with activists or any of the post activist case law. And the district court weighted into highly fact intensive questions that under rule 12B6 could only be resolved after discovery and with the benefit of expert analysis. Is there any, and yet, and yet, the FTC looked into this and took no action. The, as you know, the FTC, there are many reasons why the government may not bring a case. Our only position is that on the face of this- You seem to be arguing this is like a slam dunk case. The pleading is perfectly adequate and, yeah. We take no position as to the merits of what this investigation or what discovery may reveal. Our sole position in this case, Judge Jacobs, is that the complaint allegations spelled out here stay to claim and do so easily. And our position is there are three elements to pleading that a side deal is an anti-competitive reverse payment under activists. And we believe that the complaints clear all three of those bars. The first- List those three, yeah. Yeah, the first is monopoly power. So the brand name company here held a monopoly in the relevant product market. Meaning they have a patent. Not necessarily. It's not just that they have a patent. But here they do have a patent. Here they do have a patent. And that's why. They have a putative monopoly. Sure, but in theory, two patented drugs could be substitutable for one another. In this case, no one challenges the sufficiency of the allegations with respect to market power. And that's one distinguishing factor between the rule of reason and a quick look. The second factor is that the payment was related to the agreement to stay out of the market. This was not simply, your honors, a contemporaneous business transaction. The district court itself said that there was a relationship between the payment, between the side deal and the commitment to stay out of the market. And the third element is that the side deal was unjustified. Which means that the side deal featured a payment greater than litigation costs. And in our position, that element also includes that the payment had unusual features suggesting that it was a way to compensate the generics for staying off the market. So if it's related to the agreement, but it's justified, that is to say, how would it be justified? If it's related to the agreement, it could still be justified, because that's a third element that you just listed, correct? I did list it, but we- And if it's a transaction for value entered into in good faith as a commercial transaction, why would it be unjustified? We argue that the burden to plead that at this stage at 12B6 should be appropriately low. Because the other factors that I just identified- You mean the monopoly power? Monopoly power, and also, I don't think we should understate the finding that the complaint sufficiently alleged a relationship between the payment and the agreement to stay off the market. Judge Jacobs, if you and I enter into a- How would you settle one of these cases? Otherwise, then by paying money or allowing people to enter the market. I mean, the way you're arguing this, it looks like these cases can only go one way. And that is to a trial, as to the sufficiency or the adequacy of the patent. Post-activists, with respect to your question about settling. Post-activists, the evidence shows that the number of Hatch-Waxman settlements has actually increased because activists provided parties with assurance or with certainty that if they settle with a division of monopoly profits, that's unlawful. Sometimes certainty is the most important thing in spelling out settlements. And I'd also refer this court to the Fifth Circuit's decision in the impacts case, where the court unanimously sustained the commission's bipartisan decision that a reverse payment was unlawful, and the fulcrum of that decision. The deciding factor was that parties could settle in other ways, that there was a less restrictive alternative. And the court credited expert testimony, and the Fifth Circuit sustained that, that there are other ways to settle. The vast majority of these cases do settle without a division of monopoly profits. Is there any space between your position and- Yeah, I want to be candid that there may be a little bit of space between the position, but that space is academic in this case. So we do believe- I ask that because if you're here separately- Absolutely, absolutely. And our position is there is zero daylight, Your Honors, between our position and what the Third Circuit held in the In Re Lipitor case, and what the First Circuit held in Loester. Which is that the plaintiff must allege sufficient facts to support the legal conclusion that the payment was large and unjustified. That does not, however, require the plaintiffs to refute evidence that's uniquely in the defendant's possession. But what it does do is it requires the plaintiffs to at least articulate some facts from which a court could draw the inference that the payment was not, lacked some sort of convincing explanation. And that it appeared to be that the payment was consideration for the agreement to stay out of the market. And the FTC does share Mr. Refson's view that fair market value at this stage of the case cannot be dispositive. The fair market value cannot resolve an allegation that a party had no interest in the deal. It cannot resolve, for example, the allegation that a brand name company would have had no interest in striking a development deal for generic products because that was inconsistent with its corporate focus. And the commission's decision in impacts deals with this question. What are the sort of factors from which a court can infer that a side deal is unjustified? And the reason why we seek reversal in this case, and I should note, in most amicus cases, the FTC supports neither party. But in this case, every single factor that's listed in our impacts decision, and frankly, every single factor that is articulated by the district court itself when it quotes a briefing activist, is present here. Abbreviated timeline, payment terms that seem facially unusual, lack of industry standards, lack of due diligence. So when we saw a complaint alleging all of those things with highly specific facts, we felt like we had to support reversal in this case because we really don't, whatever difference we may have as a matter of abstract legal principles with the plaintiffs, we still do not see this as a close case. I'm happy to answer any further questions that this court may have. All right, thank you very much. Thank you very much, and I would urge the court to apply the correct activist analysis, and we think that reversal would be appropriate. Thank you very much. We'll be here for Mr. Brannon for the epilogue. Good morning, your honors, and may it please the court. After the Supreme Court's decision in activists, the FTC's chair testified before Congress as follows. I believe that the proposed legislation that declares reverse payment settlements to be presumptively invalid, but at the same time allows settling parties to overcome that presumption, would be a quicker way of putting an end to these types of settlements. And the FTC's website says today, the FTC has filed a number of lawsuits to stop these deals, and it supports legislation to end such pay for delay settlements. The FTC is referring to unenacted bills proposed in every Congress since the activist decision to amend the antitrust laws to impose a presumption of illegality for reverse payment settlements. Now, juxtapose the FTC's position that activists did not go far enough with page 159 of activists, where the court rejected the FTC's proposed presumption of illegality because an observer with even a rudimentary understanding of economics could not conclude that reverse payment settlements necessarily have an anti-competitive effect. What's happening this morning, your honors, is the plaintiffs and the FTC are advocating for a pleading standard that they wish the Supreme Court had adopted in activists, not the one actually announced. And what's the one that's actually announced? It's the large and unjustified standard, and I hope to demonstrate first- I mean, that's right, but your adversaries are saying unjustified? Well, your clients would have in their hands and in their files the justification. How can people who may be disadvantaged by one of these payments sufficiently allege that the transaction that is being scrutinized is unbalanced, unfair, or a bribe, basically? I think there's two answers to your question, Judge Jacobs. And the first is, if we go directly to the language in activists, it'll demonstrate that what the plaintiffs are advocating, that any business transaction larger than the avoided litigation cost of the patentee is enough to state a claim. That that's just irreconcilable with the language of activists. And if you would look at page 156 in activists- I've only used- Actually, I'm going to apologize, because I printed out only the Supreme Court reporter version of it, so I don't have the little lines that say what's the corresponding Supreme Court reporter page. I don't know if you have both. I have the- my pagination is for the U.S. Reports page. Yeah, and I don't get the Supreme Court reporter. I don't- I think they're always a step behind. The West Company is not up to date. Your Honor, I think it may be 2236. That's great, thank you. Sorry. We rely too much on these corporate reporters. My apologies, Your Honor. At page 156 of the U.S. Reports, the court says, where a reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or finding non-infringement. At page 159, I apologize, Judge Nardini, at the U.S. Reports, the court says again, another example, the likelihood of a reverse payment bringing about anti-competitive effects depends upon its size, its scale in relation to the payer's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification. Right there, yeah. Can I just back you up a little bit to the first quoted period, because I did find myself on the right page. The quote that says where reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services. There's not the same concern that a patentee is using monopoly profits to avoid the risk of patent invalidation or finding infringement. The thing is, two sentences down, it says, but that possibility does not justify dismissing the FTC's complaint. An antitrust defendant may show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the challenge term and showing the lawfulness of that term under the rule of reason. I guess, when it says it doesn't justify dismissing the complaint, does that suggest that look, you, or the antitrust defendant, may very well win and be able to show justification, but that doesn't mean we throw the case out this early. How do you reconcile those two statements? This is a critical question, your honor, and it's important. I want to be really emphatic about this. What the court is talking about, it's talking about the complaint before the court at the time. The court was resolving a circuit split on what the appropriate pleading standard is for one of these claims. It had two alternatives, it carved out a different path under the rule of reason. The FTC, in FTC the activist, unquestionably stated a very large overpayment, a very large and unjustified payment. The court crafted this standard based on the allegations that were before it, in that very complaint. Now this is important, because in this case, the appellants say, well, basically the appellees make too much of the allegations that the FTC made there, and the court didn't really focus on it. Now this is at reply eight. The appellants concede that we accurately described the overpayments alleged in the 1,000% range, meaning up to a tenfold overpayment. But the plaintiffs say, as I just summarized, they argue it is based on FTC allegations that the Supreme Court did not mention its opinion. With the court's indulgence, I'd like to spend a moment on this, because the seven paragraphs of the FTC's complaint in activists that we described in red brief three come directly from page 145 of the US Reports of Activists. With the court cited to paragraphs 66, 77, and 81 through 85 of the FTC's complaint. The only specific references to any paragraphs of the FTC's complaint in the entire opinion are all right there on page 145. So that's actually quite a conspicuous reference, and I think this answers your question, Judge Jacobs. There is no, and I can take you to more language, there is no question that under activists, the Supreme Court is saying that a fairly valued transaction does not state a claim. The plaintiffs have to allege an overpayment in the complaint that was before that court going to your question, Judge Nardini. That complaint clearly did. They alleged a tenfold overpayment. So it's your view that if a plaintiff alleges an exorbitantly large payment, that sort of implicitly gets to the unjustified nature of it, the unexplained nature of it, and then you just recover it. But if you just show that you're over large, whatever the threshold is for large, which would be in excess of the anticipated settlement costs, if you're just a bit above that, then what? And then you have to allege what? Or you're doomed as a plaintiff in your view? I think there's two answers to that question. The first is, activist was not setting out some kind of a peppercorn standard, where you just allege a business transaction that happened in nominal terms happens to be a little bit more than avoided litigation costs. And you're off to the races for burdensome antitrust litigation. Those weren't the facts before the court. That's not what they were talking about. What activists is getting after is, is there some allegation that some large windfall has been transferred from the patent holder to the generic such that we now have a concern that that has somehow distorted the normal competitive dynamics of settling one of these cases. And they're talking about something large and clear, like was before the court in that case, and has been before the courts in numerous lower courts. The Third Circuit cases that were mentioned by my friends on the other side, they're talking about hundreds of millions of dollars. The FTC's counsel mentioned the Lowestrand case from the First Circuit. There, the allegation was a no AG provision worth $300 million. Activists did not set about relegating Article III courts to become like finely tuned appraisers of, you know, whether someone should have paid a dollar instead of $1.10. They're talking about very large directional distortions of the settlement dynamics. And I think in answer to your question, Judge Jacobs, it's very important to understand that the position of the appellants is clear. They answered your question clearly about fair market value, much more clearly, frankly, in their blue brief than occurred this morning. In their blue brief, they say on page 45, a payment for fair value might still represent an improper quid pro quo for an agreement to delay generic entry. That statement is irreconcilable with the guidance that activists gives us. Activists- Let me ask you, if you have a moment, to turn to particulars. The Forrest Watson agreement, where millions of dollars is going to a Brazilian company and then somehow making its way back, I read about that transaction. And it's very hard to understand what kind of justification there is for that, which frankly sounds a little bit like money laundering. Your Honor, I want to be respectful to your interpretation of that. So please don't take my answer to be flippant. The Watson agreement is actually, should be the easiest for the court to resolve. There was no business transaction alleged. There's no business transaction alleged between Forrest and Watson. But there is an allegation of money going, and it doesn't help if there's no business transaction, just money. Let me explain to you why. If you look at the complaint and the plaintiff's own allegations, they concede that Forrest, Watson, and the Brazilian company, Moksha, were in three-way contractual privity in demonstrably unrelated business transactions as early as October 2012, long before the settlement, had nothing to do with the patent litigation. These are pharmaceutical companies that do other business. Now, I think, I hope I can address your question very directly. If you look at the allegations that are made concerning the Watson settlement, the allegation is that Forrest made a loan, a repayable loan, to Moksha of just under $7 million, $6.9 million. And then the plaintiff's allegation is that in return for that loan of $6 million to Moksha, Moksha then transferred value to Watson in excess of $19 million. Those numbers don't add up. There's no money laundering that would allow a $6.9 million transfer to become $19 million going back the other way. It doesn't make any sense. But these are transactions that don't make any sense to me either. Well, the point is, if your honor, if you look, I want to be very direct about this because you're asking a direct question. If you look at JA 771, you'll see section 5A of the agreement and plan of merger between Forrest and Moksha's parent. That's from October 2012. That's 13 months before the Watson settlement. It has nothing at all to do with this litigation. It just has to do with the fact that these are pharmaceutical companies that do other business. The fact that they had a pre-existing relationship, I mean, I guess can cut both ways, right? You can say, well, the fact of the pre-existing relationship, you know, it couldn't, the three-way relationship itself couldn't have any bearing on the subsequent settlement because it existed, it could not have been prompted by the desire to settle. On the other hand, if it was a convenient vehicle to send money back from party A to party B, then it suddenly can become quite relevant, right? It can be just as relevant as a check written from A to B. Well, the standard here, and this is getting to a point that Judge Sack asked earlier, so I want to make sure that we get to that. The standard here is the plaintiffs have to plead facts sufficient to create a reasonable expectation that discovery will reveal evidence of a legal agreement. They don't allege any business transaction between Forrest and Watson at all. All they can come up with is this idea that, oh, they were in business 13 months ahead of that for something that has nothing to do with this patent litigation, right? These are large pharmaceutical companies. They do unrelated transactions all over the world. Right, but if they have this pre-existing relationship and they then choose to use that as a conduit for money, then it suddenly becomes relevant. So the question is, have they adequately alleged that in the present, or at a time sufficiently related to the timing of the settlement, was their money passed effectively? Was their value effectively passed from A to B? The fact that it was not in a brand new relationship isn't necessarily here or there, right? Well, you're on a- You can settle with a competitor with whom you had a pre-existing relationship. I guess I'm just not seeing how the pre-existing nature of a relationship has any bearing one way or the other. Well, I want to be really clear in answering your question. The pre-existing relationship establishes why the parties could be doing something at the same time. So that doesn't- I just want to be clear. It doesn't create any suspicion that they had a transaction. We have to look at the plaintiff's allegation. This is undisputed. The plaintiffs have no response for this in their reply. The allegation is that Forrest made a loan of $7 million. It was already in a relationship to be lender-lendee with Moksha long before the patent litigation. So I'm just showing that. That doesn't create any suspicion. They extended a loan of $7 million, repayable. How does that yield a transfer of value for Moksha to Watson for $19 million? Which is what they allege, because plaintiffs also concede- That I understand. That I understand your argument, at least, of saying that as alleged, a particular transaction does not allege a transfer of value. But again, I guess, yeah, okay. And do you concede that with respect to the, at least with respect to the other five transactions, that they are related to the agreement for the generic to stay out for some period of time? Are the transactions related? I mean, I'm not saying it's critical, but I'm just wondering if you can see that that is so. Well, there's a very important part of your question that kind of gets to the crux of the case. We absolutely do not concede that they're related to any kind of a payment for delay. And the district court assessed- That they were related to the settlement of a lawsuit. The district court assessed them as having been related. They were certainly contemporaneous. And for purposes of challenging these allegations, we haven't focused or challenged the fact that they were related. They could be related and be fair market value, to go to your question earlier. The plaintiff has to allege something else. Let me be really clear. Simultaneity of a business transaction with settlement is insufficient, right? So we haven't needed to focus on that because the district court assessed them as being related. And nonetheless, determined that the plaintiffs did not meet their burden to allege larger unjustified payments. Can you address another question for me? Which is this notion that what relevance does it have to the analysis in terms of the plausibility of the allegations? That this is not a case where there's an alleged single reverse payment, right? Between the putative patent holder and one generic manufacturer. But this is happening with a number of potential generic manufacturers, all of whom are engaging in settlements in parallel and in somewhat linked, right? Because if somebody enters the market, then everything goes to pot, right? And then everybody can rush in. This is sort of not a technical term, but it all falls apart, right? I mean, doesn't that add to the plausibility of the allegation that, wait a minute, wait a minute. This is about more than just settling litigation. This is about a concerted effort to keep people out of this market. Now, maybe it's justified in the end. That's what, honestly, I'm not sure I really understand activists to tell the honest truth about the whole thing. And how we're supposed to decide any of this without understanding the validity of the patent. But we are in a world where we are, where supposedly the validity or an infringing nature of these various patents is not supposed to be an issue. How does that matter, the fact that there are all these settlements happening all at once? And yes, they're taking different forms. But you have the allegation, I think, on the part of the plaintiffs is, yeah, they're taking different forms because they're trying to really cover it up nice. They're not stupid. They're not all just paying out a big check to five different people. But they're figuring out, well, I can pay you off because I've got a relationship in this company in Brazil. And you, I can take on as a supplier. And you, I can do this way. We're going to find five ways to basically send you guys money using our super competitive profits. And therefore, we keep our monopoly. We're still making more money than we would if all the generic manufacturers came in. So how does that matter, the fact that there are simultaneously more than one settlement? So the answer to your question, Your Honor, I want to be clear and then provide an explanation. The answer to your question is no, it doesn't matter, and here's why. First of all, you mentioned the phrase parallel. Just to be clear, as a factual matter, these agreements were reached at separate times, with separate parties, over a period of 13 months. So, for example, how could the Watson settlement that occurred 13 months after the hetero settlement was a complete fait accompli, how could that be probative of whether the hetero transaction was a large and unjustified payment? There's not that connection there. Now, that's the factual aspect. And your argument there would be that once they settled with party A, party E might not have settled, and they might have, this litigation could have gone forward, and they could have been hitting each other over the head with briefs and motions and whatnot, right? That's absolutely right, Your Honor. That's absolutely right, Your Honor. Second, and this is important, and I want to take a moment to be really emphatic about it. There is no basis, I just noted, in fact, about sort of the logical order of the settlements occurring separately over 13 months. Also, in the fact of the complaint, the plaintiffs pleaded this case as six separate bilateral settlements. This is very important. This is how they pleaded. This is how they framed their complaint. And if you look, for example, starting at JA 1557, you can see that the plaintiffs allege bilateral conspiracies separately between Forrest and each of the generics separately. They don't allege any kind of overarching conspiracy or multilateral conspiracy. And there are no facts. It's not just a structure of their complaint. There are no facts alleged in support of any overarching or multilateral claims. I want to be very clear that this court's precedents hold that the court cannot impute a rim to connect alleged spokes when plaintiffs have not pleaded one. And two examples of such precedents include Judge Carney's decision in D'Addario v. D'Addario at 901 F380 and Judge Winter's decision in United States v. Suref at 15 F3 225. Well, allowing, as you argue, that you have serves in not arguing a single unified conspiracy. Is it not suggestive that you have six of these transactions that your client is entering into these transactions for the purpose of beating back generics? It's not suggestive of that at all, Your Honor. And I want to respectfully give another illustration of why the number of settlements doesn't support any kind of anti-competitive inference here. Most patent cases settle. If you look at the Schildkraut article that's cited in the activist decision, 95% of patent cases settle. And we wanted to make sure we were providing the most accurate information we could to the court. That article is from like 2004 or something like that. And we went and we looked on Pacer. According to Pacer, as of today, 75% of patent cases settle. So that's a range of- Do they settle with reverse payments? The Pacer statistics don't go into that. I guess, but that's the relevant, that would be the relevant statistic, right? Is, we're not just saying that they settled, I don't think anybody would argue that there would be a problem here if all these settlements had entered, but the basic flow of payments had been toward Forrest, right? Well, to answer your question, that allegation was made in the Seventh Circuit's case. It's called AbbVie, it's also known as Humira. And some of the same plaintiffs that are in court today argued there, unsuccessfully by the way, that in that case there were actually multiple settlements, but they made allegations concerning two at issue. And they said, even if each of those settlements independently is not problematic, when you put them together, that they somehow raise an anti-competitive inference. And there, the Seventh Circuit rejected that, concluding that zero plus zero equals zero. And that zero plus zero analysis applies here as well, because, your honor, what's happening is, because they can't make any kind of concrete allegations about any of the business transactions being overpayments. That's what's happening. They haven't been able to allege anything like what occurred in- They don't argue that it's zero, even if you accept that it's not. Right, but they're just saying- One is where you clear the line, if their argument is 0.3 plus 0.3 plus 0.3 plus 0.3. At a certain point, you get well above one. Well, again, they have- Math analogies are unhelpful, I think. They haven't made an allegation that any of the transactions is a large, unjustified payment. And so, what we're saying is, the idea is, activists is getting at, has a windfall been transferred to the generic to distort the competitive dynamics? Hedero's compensation in the first settlement has nothing to do with what Watson got later on. There's no allegation that there's anything between them, so you would never aggregate those alleged business transactions. And just so you can see that there's nothing nefarious about the number of settlements, that AbbVie decision that I just mentioned from the Seventh Circuit, there were nine settlements at issue in that case. In the Actos decision that we cite in the red brief from Judge Abrams in the Southern District, there were 12 settlements involved in that case. It's very normal, we provided the authority for this in our statement of the case, it's very normal in these cases where there's multiple first filers to have multiple settlements. I do want to make sure that I get to Judge Saks question that was not posed to me, but that was posed to my friend's opposing counsel. There's two very important, and I hope clear answers to your first question about whether the district court did anything inappropriate under Thrombley or any other precedent. The first is, most important, and the plaintiffs concede this, is that obviously on de novo review, it's this court's reading of the complaint. And the documents incorporated by reference that matters under Rule 12, that's the first point. The second, with the court's indulgence, I'd like to take just a moment to illustrate why the district court was faithfully applying Thrombley, Iqbal, Anderson News, all of the circuits, other precedents, and in particular, the district court did not weigh any competing plausible inferences, your honor. There are some snippets that are provided in the appellant's papers. As soon as you contextualize those, it all evaporates, your honors. For example, if you look at Essay 89 on the hetero agreement, the district court used the phrase more plausible only after describing plaintiff's proposed inference as quote, nonsensical in the prior sentence. The court went on to say at Essay 91 that based on- So we can ignore the words more plausible and at least the same result? Absolutely, your honor. And what I want to make clear- So if we go through five or six, depending how you look at it, and we see language that suggests that the district judge was saying more plausible rather than plausible, or I guess less plausible rather than plausible. We can ignore language like that because that's not really what the judge was saying. We look past that. Absolutely, your honor. I mean, the court could address it in one of two ways. One is I have all the citations that I'd like to provide to you because I think this is an important element that goes through the appellant's papers. So it's Essay 89 and 91 on the hetero transaction. It's Essay 97 on the torrent transaction. It's Essay 103 on Alchem. Essay 108 on Glenmark. Enough. What you'll see, your honor, when you go through these, you'll see that it's not any weighing of competing plausible inferences under Anderson News. I'm sorry, I misunderstood. If you want to continue that, which I've- Yeah, if you had one more, I'd- Yes, it was Essay 110 and 112 on Amerigen and Essay 116 on Watson. And when you look, we map this all out based on the appellant's arguments. When you look at each of those, it marries up with that example I just said where the district court said more plausible. And then five or six words earlier, he said that Plaintiff's proposed inference was nonsensical. So under Anderson News, this is not a weighing of competing plausible inferences. It's simply using comparative language when concluding that Plaintiff's proposed inference was flawed and implausible. And there are some other very important distinctions here that are between this case and Anderson News. First, at the outset, appellant's blue brief was a lot less friendly to Twombly than some of the statements that were made in court today. In appellant's blue brief, appellants say that Twombly is limited to antitrust cases alleging mere parallel conduct. Obviously, Iqbal had nothing to do with antitrust, and Iqbal applied Twombly as a matter of first principles of pleading requirements. That's what we're talking about this case, pleading requirements. Twombly and Iqbal both expressly acknowledge that Twombly, quote, retired the Conley v. Gibson no set of facts pleading standard that had persisted for 50 years. So obviously, Twombly is not just limited to antitrust cases and then trying to limit it even further to some narrow category. That's really not what I was trying to do. I was just concerned about the question of whether Twombly, whether the question that was being addressed by the district court was with plausibility rather than more plausible than the other, some other plausibility. Right. And I guess I want to give a very candid answer to that question, Your Honor. Again, I think we've demonstrated, or I hope when you look at the sites, you'll see we've demonstrated that he did not, or the district court did not engage in any kind of impermissible weighing. But the language nonetheless takes some work to figure that out because it's a long, very careful opinion. So if this court wanted to address that in some prudential way, that doesn't affect whether the judgment should be affirmed. In each of these agreements, it goes back to Judge Jacob's question. The plaintiffs have not alleged that there was a larger unjustified payment. They quarrel directly with the point that Your Honor asked about whether a fair market value transaction can constitute a, can state a claim under activist. It cannot. There's nothing in the activist decision that supports that. I think this is settled, but can you confirm this is the first case presented to this court under activist? Yes, Your Honor. We address that directly in the red brief. It is the first case to directly present this issue in a patent settlement context. There was one important matter that this court decided in 100 Contacts. And if you'll allow me a moment to address that, that involved a trademark settlement. And the plaintiffs, they addressed that in their reply brief. And I want to make sure. We'll find it there. I want to make sure that the court is not left with any misimpression about that case. What case? 1-800-CONTACTS, Your Honor. It's a 2021 decision of this court. Appellants argue that that supports them. Is there a question, Your Honor? I'm anxious to hear what you have to say on it. Appellants contend that 1-800-CONTACTS supports them. That's demonstrably incorrect. If you'll allow me a moment to demonstrate why. And we've kept you up considerably past your time, but why don't you please take your time to answer this question. Plaintiffs ignore that this court expressly rejected both the FTC's inherently suspect classification as well as the FTC's fallback alternative of purported direct evidence. Yes, Your Honor? So when the plaintiffs here contend, for example, at Blue Brief 29, that, quote, unlike mere parallel conduct, reverse payments raise the suspicion of anti-competitive conduct warranting discovery, the plaintiffs are attempting the same kind of shortcut that this court denied to the FTC in 1-800-CONTACTS. Critically, in 1-800-CONTACTS, this court expressly declined to hold that the FTC had ever met its initial burden of adequately alleging a prima facie case. And this court analogized to this court's prior decision in Clorox, where the court held that the plaintiff failed to present a prima facie case of anti-competitive harm, but the court nonetheless went on to detail how the pro-competitive justifications of the agreement weighed against finding an antitrust violation. This is all at page 119 of 1-800-CONTACTS. And the plaintiffs say, well, that's different because there was a trial there. This is very important, Your Honor, to keep in mind. There was an administrative in-house trial at the FTC in that case. By the time the case got here, this court dismissed the FTC's complaint. That was all the relief that that party could get at that time. But when you read that decision, it's clear that this court was saying that the FTC did not make out a prima facie case to even proceed in the first instance. And it only proceeded because it was an administrative trial. Okay. Thank you very much. I think we have your argument. We've kept you up considerably past your time. Why don't we hear from Mr. Repson, who's held two minutes for rebuttal. Thank you, Your Honor. Thank you. Mr. Honor, thank you. I'd like to make three quick points. First, with respect to the 1-800-CONTACTS case, that was after a trial and it applied the rule of reason after a trial. And it was an administrative trial. It wasn't a reason to dismiss the case on a motion to dismiss. Second, the district court's opinion here is directly contrary to what activists said. As we pointed out when we were quoting page 156 of activists, the issue of justifications is an issue for determination in the course of the antitrust litigation. The Supreme Court said the possibility of justifications was not a reason for dismissal. The district court here said that if the plaintiffs don't make allegations ruling out the possibility of justification, that was a reason for dismissal. That's directly contrary to activists. The allegations that we've made here are very similar to the ones the FTC made in activists. The court in activists did not point out the 667% to 1,000% overage in the price over what the brand had paid for the services in other cases. That was a statistic that the defendants have emphasized in this case, but it's not mentioned at all in the activist opinion itself. All activists pointed to was the fact that the allegation supported the inference that the side deal was of little value, and that the true point of the deals was to share monopoly profits with the generics. That's what we've done here. And the last point that I want to make has to do with Watson, which is really the clearest place where the district court went off the tracks, off the rails. We pled that based on activists' SEC reports, its merger documents, that the documents suggested that Watson had made a $15 million payment, a payment in excess of $15 million to Watson. The district court said because we can't explain how they made that $15 million, the case should be dismissed. Well, it was based on what Farr said itself in its SEC reports. It made a disclosure that suggested that the payment was in excess of $15 million. You certainly could, Judge Sachs. I don't think that that would be correct, but you certainly could, and that would be a reversal, and we would go back to the district court to try the five reverse payments, if that's what you resulted. But I think- I mean, we don't, nobody's theory of this case, maybe. We don't have to find all six of them come out the same way. The facts can be different, and with respect to Watson, I think, may very well be different. Yeah, I mean, I think you should reverse on all six, but that's correct. Good job. If you reversed on one, it would send us back to the district court. In fact, I mean, that's happened in some of these other reverse payment cases. In the Menda case, which was in the Southern District of New York, there were several settlements involved. Only one of the settlements was found to have a reverse payment, and that case went all the way when they're just on the basis of one settlement out of several. So that's an option. I'm talking about seven cases out of one. I'm in the other way. I'm sorry. What I mean, it's probably not worth me making it clear at this point, but what I mean is I'm assuming that Watson is the exception, and we would, we could, if we so concluded, affirm with respect to what the district court did in Watson, but reverse as the other five, and which would require continuing litigation. Yeah, I did understand that to be meant when you said you would, because the district court found that five of them were large and found there was no large for Watson, that you could say the district court was right about the failure to plead large with respect to Watson, but it was incorrect to require justification on the other five where it found large. And that's certainly an option that this court has. That's fine. Well, thank you very much. We will take the case under advisement. Let me just say, as to all the parties, it was exceptionally well argued. Thank you very much. We'll get back to you. Thank you.